## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| **ROY PEPPIATT,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. _____ |
| **WESTCON MFG, INC. d/b/a/** | ) |
| **THEAM USA,** | ) |
| | ) |
| Defendant. | ) |

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Roy Peppiatt, by and through undersigned counsel, hereby complains against Defendant Westcon Mfg, Inc. as follows:

## INTRODUCTION

1. This case arises under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, the Maine Whistleblower Protection Act ("MWPA"), 26 M.R.S. § 831 *et seq.*, and the Maine Human Rights Act ("MHRA"), 5 M.R.S. § 4571 *et seq.*

2. This case challenges Defendant's: (1) unlawful age discrimination against Plaintiff in violation of the ADEA and the MHRA; and (2) retaliation against Plaintiff for engaging in protected conduct under the MWPA, ADEA, and MHRA.

## THE PARTIES

3. Plaintiff Roy Peppiatt ("Peppiatt") is an individual residing in the Town of Falmouth, County of Cumberland, and State of Maine.

1

4. Defendant Westcon Mfg, Inc. d/b/a THEAM USA ("Westcon") is a Maine-based manufacturer of conveyors mounted onto mixer trucks, as well as associated products.

5. Westcon's manufacturing plant is located in Brunswick, Maine.

6. From May 14, 2018 to September 12, 2018, Peppiatt was an employee of Westcon.

7. At all times relevant during the past 2 years, Westcon has employed more than 14 individuals.

## JURISDICTION AND VENUE

8. Prior to filing this Complaint, Peppiatt filed a charge of discrimination with the Maine Human Rights Commission and the EEOC and received a notice of right to sue letter pursuant to 5 M.R.S.A. § 4612, sub-§6 and 4622, sub-§1, ¶ C on or about August 23, 2019.

9. Venue is proper in this Court because all of the discriminatory practices alleged herein occurred in the County of Cumberland and State of Maine.

10. The Court has federal question subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.

## STATEMENT OF FACTS

11. Peppiatt began working for Westcon as a machinist on May 14, 2018.

12. Westcon hired Peppiatt at the advanced age of 80 because Defendant was having trouble finding a qualified replacement after its machinist of nearly two decades walked off the job.

13. Peppiatt is a master tool and die maker with 65 years of experience in the trade. He also taught precision machining at Southern Maine Community College.

14. Shortly before he started working for Westcon, Peppiatt interviewed with the company's Human Resources ("HR") representative, Laurie Garrec, who is the wife of Westcon's CEO John Garrec.

15. Laurie Garrec told Peppiatt that Westcon had a "young crew," and she hoped Peppiatt would be open to teaching them some of his skills.

16. Within the first week of Peppiatt's employment at Westcon, a co-worker named Sean Urquhart ("Urquhart") began harassing him and questioning his job performance.

17. Urquhart was a project engineer for Westcon.

18. At the time, Urquhart was 32 years old—almost 50 years younger than Peppiatt.

19. The prior machinist who walked off the job at Westcon was 56 years old at the time.

20. Peppiatt spent the first couple days of his employment cleaning the machine shop and the machines, which were filthy. Peppiatt explained to the CEO, John Garrec, that this was necessary in order to ensure quality parts machined with precision.

21. Urquhart criticized Peppiatt and told him he was not hired to clean machines.

22. Peppiatt's direct supervisor was the CEO, John Garrec.

23. Urquhart repeatedly argued with Peppiatt and attempted to supervise him, even though Peppiatt did not report to Urquhart, who had 60 years less experience in the field.

24. Urquhart seemed threatened by Peppiatt's knowledge and experience, making it immediately clear that he did not like or respect Peppiatt.

25. Peppiatt complained to John Garrec about the way Urquhart was treating him the very first week of employment.

26. During Peppiatt's second week of employment, Urquhart disagreed with Peppiatt about the proper tool to measure a part that Peppiatt had machined. Urquhart became unreasonably angry with Peppiatt during this confrontation.

27. Eventually, Peppiatt complained to HR (Laurie Garrec) about Urquhart's behavior toward him. HR was nonresponsive.

28. Urquhart continued with harassing and antagonistic behavior toward Peppiatt, which HR did nothing to remedy. The harassing behavior increased after Peppiatt complained to HR.

29. Urquhart's behavior was not only harassing but juvenile, often disrupting Peppiatt's work. For instance, Urquhart played loud, heavy-metal music in the shop even though Peppiatt asked him not to because the music made it hard for Peppiatt to concentrate on machining. In response to these complaints, Urquhart would walk into the machine shop, turn on the music loudly just to bother Peppiatt, and then leave the room.

30. Receiving no assistance from HR, Peppiatt attempted to speak with another co-worker in purchasing named Robert Benoit about the way Urquhart was treating him. Benoit also ignored Peppiatt's complaints about Urquhart.

31. However, Urquhart learned that Peppiatt had complained about him to both HR and Benoit. In response, Urquhart physically confronted Peppiatt, pointing in his face and screaming angrily, "Never speak to me again!"

32. Within a week of this altercation, Peppiatt machined a tool for Urquhart. Peppiatt finished the job and asked Urquhart where he should put the finished tool. Urquhart screamed across the machine shop at Peppiatt: "I told you never to speak to me again!"

33. In addition to his reports of harassment by Urquhart, Peppiatt made a protected whistleblower complaint about an unsafe condition with a lathe in the machine shop.

34. The lathe had a defect that caused a problem with threading. Peppiatt considered the problem to be not only an inefficiency but a safety hazard as well.

35. Peppiatt had a good faith basis for believing that the broken lathe created an increased risk of bodily injury whenever the machine had to be stopped manually, in an abrupt fashion.

36. Peppiatt notified Urquhart that he believed the lathe was not functioning properly. Westcon brought in a technician to look at the machine, but Urquhart and others treated Peppiatt in a retaliatory manner for raising this issue. Westcon also ignored the safety concern Peppiatt raised about the lathe.

37. On another occasion, a Westcon employee requested on a Friday that Peppiatt work on machining a part over the weekend because it was needed for Monday morning. Mr. and Mrs. Garrec were on vacation and unavailable for Peppiatt to contact and discuss overtime.

38. Peppiatt worked on Saturday in an effort to be helpful and get the part finished by Monday morning, but Laurie Garrec treated him in a harsh and retaliatory manner for working overtime.

39. Toward the end of Peppiatt's employment, Westcon brought in a much younger employee named Mitch, who had limited machining experience, to work with Peppiatt.

40. Mitch accused Peppiatt of being "too slow."

41. Westcon believed Peppiatt was not able to keep up with the company's production needs because of his age.

42. Westcon, by and through its agents and employees, discriminated against Peppiatt because of his age.

43. Westcon, by and through its agents and employees, retaliated against Peppiatt for making complaints about the way he was being treated.

44. Westcon, by and through its agents and employees, retaliated against Peppiatt for making complaints about the safety of the lathe described above.

45. Westcon knowingly and willfully retaliated and discriminated against Peppiatt in violation of the company's handbook and in violation of State and Federal law.

### COUNT I – AGE DISCRIMINATION IN VIOLATION OF THE ADEA
### (29 U.S.C. § 621 *et seq*.)

46. Plaintiff repeats the allegations contained in Paragraphs 1 through 45 as if fully stated herein.

47. Westcon's criticism of Peppiatt's performance, and the eventual termination of his employment, was in fact pretext for age discrimination.

48. Defendant took adverse employment action against Plaintiff as a direct and proximate result of his age.

49. Defendant showed discriminatory bias toward older workers by retaining similarly situated younger employees who were less qualified than Plaintiff.

50. Defendant showed discriminatory bias toward older workers by favoring younger workers compared to older workers like Plaintiff.

51. Unlawful age discrimination has taken place within the meaning of the ADEA.

52. Defendant discriminated against Plaintiff on the basis of age knowingly or with reckless disregard for whether its conduct was prohibited by the ADEA. Because Westcon's

discrimination was willful, Peppiatt is entitled to liquidated damages of twice the amount of his lost wages.

53. As a result of Defendant's discriminatory actions, Peppiatt has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Roy Peppiatt requests that the Court award him damages in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT II – RETALIATION IN VIOLATION OF THE ADEA
**(29 U.S.C. § 621 *et seq*.)**

67. Plaintiff repeats the allegations contained in Paragraphs 1 through 66 as if fully stated herein.

68. Peppiatt engaged in protected activity under the ADEA by opposing Westcon's unlawful practice of discriminating against him on the basis of age.

69. As a result of the above protected activity, Westcon took adverse employment action against Peppiatt.

70. A causal connection and close temporal proximity exist between Peppiatt engaging in the above protected activity and multiple instances of adverse action taken against him by Westcon.

71. As a result of Defendant's retaliation, Peppiatt has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages

including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

72.   Westcon recklessly, knowingly, and/or willfully retaliated against Plaintiff in violation of the ADEA and therefore Peppiatt is entitled to liquidated damages of twice the amount of his lost wages.

WHEREFORE, Plaintiff Roy Peppiatt requests that the Court award him damages in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to him by law.

### COUNT III – VIOLATION OF THE MAINE WHISTLEBLOWER PROTECTION ACT
**(26 M.R.S. § 831 *et seq.*)**

73.   Plaintiff repeats the allegations contained in Paragraphs 1 through 72 of his Complaint as if fully set forth herein.

74.   Peppiatt engaged in protected activity within the meaning of the Maine Whistleblower Protection Act ("MWPA") by making a complaint of harassment to Westcon on more than one occasion.

75.   Peppiatt also engaged in protected activity within the meaning of the MWPA by informing Westcon that one of its machines, a lathe, was unsafe and defective. Peppiatt had a reasonable, good faith basis for believing his report to Westcon about this particular machine.

76.   Peppiatt engaged in the aforementioned protected activity in good faith.

77.   Westcon refused to listen to Peppiatt's explanation for why he believed the lathe in question was unsafe.

78. The aforementioned instance(s) of protected conduct bear a causal relationship to the adverse employment action(s) alleged herein.

79. As a result of Defendant's whistleblower retaliation, Peppiatt has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Roy Peppiatt requests that the Court award him damages in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to him by law.

## COUNT IV – VIOLATION OF THE MAINE HUMAN RIGHTS ACT
**(5 M.R.S. § 4571 *et seq.*)**

80. Plaintiff repeats the allegations contained in Paragraphs 1 through 79 as if fully stated herein.

81. For all of the reasons set forth in Counts I through III above, unlawful discrimination and retaliation against Plaintiff have taken place within the meaning of the Maine Human Rights Act.

WHEREFORE, Plaintiff Roy Peppiatt requests that the Court award him damages in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to him by law.

## JURY TRIAL DEMAND

Plaintiff Roy Peppiatt hereby demands a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.

Dated: November 18, 2019 */s/ Laura H. White*

                                                _____
Laura H. White, Bar No. 4025
*Attorney for Plaintiff*
BERGEN & PARKINSON, LLC
62 Portland Rd., Suite 25
Kennebunk, ME 04043
(207) 985-7000
lwhite@bergenparkinson.com


/s/ *Danielle Quinlan*

_____
Danielle Quinlan, Bar No. 5480
*Attorney for Plaintiff*
BERGEN & PARKINSON, LLC
62 Portland Rd., Suite 25
Kennebunk, ME 04043
(207) 985-7000
dquinlan@bergenparkinson.com